---

## THE FREY.

### (District Court, S. D. New York. March 10, 1899.)

1. SHIPPING—DAMAGE TO CARGO—UNSEAWORTHINESS FROM IMPROPER LOADING.

The loading of drums of glycerine, which, from their shape and weight, require care in loading, in the between-decks, without filling the entire cargo space to prevent them from jumping, and when the entire loading was so light as to bring the glycerine very high above the water, where it would be subject to the greatest effect of the rolling of the vessel, and the result of which was that the drums shifted and the cargo was damaged thereby, although no extraordinary weather was encountered, constitutes such improper loading as rendered the vessel unseaworthy at time of sailing, and the damage resulting is not within exceptions in the bill of lading against "unseaworthiness" or "damage by leakage, breakage, or contact with other goods," since the bill of lading also bound the owners to the exercise of "due diligence to render the vessel seaworthy"; nor are they, for the same reason, relieved from liability by section 3 of the Harter act (2 Supp. Rev. St. p. 81), which does not cover negligence in loading, stowing or ballasting the ship.

2. SAME—HARTER ACT—EFFECT ON FOREIGN VESSELS.

Foreign vessels being entitled to the benefit of the Harter act (2 Supp. Rev. St. p. 81), they will be held subject to its limitations by courts of the United States in suits for damages to cargo arising on the high seas on voyages to this country.

This was a libel by Frederic Marx and others against the steamship Frey for damage to cargo.

Carter & Ledyard, for libelants.
Convers & Kirlin, for claimant.

BROWN, District Judge.   The above libel was filed to recover the damage caused to some drums of glycerine and to certain bales of rabbits' skins on board the steamship Frey, on a voyage from Dunkirk, France, to New York in January, 1898.   Through excessive rolling of the ship, the drums of glycerine stowed in the 'tween-decks, forward of the forward hatch, got adrift and shifted.   Some of the drums were cut and their contents spilled, which, after the ventilator had been carried away, leaked through the opening upon the rabbits' skins in the hold beneath.   The defendant claims that the loss arose from the heavy weather, constituting a sea peril, and further claims exemption under the exceptions contained in the bill of lading.

The Frey is a schooner-rigged steamer of 1,948 tons net, 3,000 tons gross, 322 feet long, 41 feet beam and drawing about 23 feet. Upon this trip she was very lightly loaded, carrying only about one-sixth of her cargo capacity.   Drums of glycerine constitute a somewhat difficult cargo to stow safely for heavy weather, both from their shape and their weight.   The libelants gave some evidence tending to show that such drums should not be loaded in the 'tween decks; but this evidence is, I think, fully met by the evidence for the claimant, showing that stowage in the 'tween-decks is by no means uncommon, and that it is safe and proper, if the other weights of the cargo are properly distributed, and the ship properly ballasted. The evidence for the claimant also, in my judgment, shows good ordinary stowage of the drums of glycerine in the 'tween-decks considered by itself alone and independently of its relation to the light loading of the ship, except possibly in one particular, namely, the absence of a complete filling of the cargo space up to the deck above in order to prevent the drums from jumping.   In this case, as I understand the evidence, there was more or less of vacant space above the drums, which permitted them to jump.   But besides this, the evidence shows two additional difficulties, viz.:   (1) That the extremely light load brought the glycerine in the 'tween-decks very high above the water where the rolling was most felt; and (2) the lack of sufficient additional weights above, whether of cargo or of ballast, to prevent short and jerky rolling, and to make the vessel's motions easy.   To avoid these difficulties with so light a cargo, the drums of glycerine, being from their nature somewhat difficult to stow securely, should have gone in the lower hold, and other and sufficient heavy weights stowed above to make the vessel easy.

The defendant contends that the shifting of the cargo should be attributed to sea perils.   The proof leaves no doubt that this shifting was due to the excessive rolling of the ship; and the only question in this regard is, whether the excessive rolling should be ascribed to extraordinary weather, or to the improper loading and ballasting of the ship.   On careful consideration of all the testimony upon this question, I do not think that the excessive rolling of the steamer can fairly be ascribed to extraordinary weather.   There were one or two gales, but they were not of any unusual character; and neither arose until after the shifting of cargo began.   There were heavy seas and cross seas; but the testimony does not show that it

THE FREY.                                                                      669

was these seas that were extraordinary, but the behavior of the ship. The steamer shipped no sea forward, and but one or two aft, which, as the master says, were of no account; nothing on deck was carried away; there was no unusual racing of the propeller; her engines were kept in motion about as usual, and the ordinary voyage of 17 days was prolonged but a single day. On the third day after passing the Lizard, it was found that the drums of glycerine were loose, and on account of the heavy rolling of the ship it was impossible to readjust them, and the whole cargo in the 'tween-decks forward was soon in confusion. The ship had never behaved so before: but at that time there was no gale, but only a heavy rolling sea. The rolls of the ship were short and jerky; and the glycerine in the 'tween-decks, being high above the water, was more affected than it would have been in the hold. Under such conditions, it is clear that the 'tween-decks was not a proper place for drums of glycerine; or if stowed there, that they should have been more thoroughly wedged in from the top as well as the sides, and that more weights should have been stowed above.

Questions pertaining to the proper distribution of heavy and light cargo or proper ballasting and stowage in order to make the ship sufficiently easy and safe where the cargo is light, are not questions that devolve upon the shipper to determine, nor is he in any way responsible for their solution. The responsibility is upon the carrier alone; and as I cannot find in this case that there was any such extraordinary weather or seas as might not have been reasonably anticipated in crossing the Atlantic in the month of January, or any such weather as naturally to cause such a shifting and destruction of cargo in a well-loaded and well-ballasted ship, I must ascribe the primary cause of this loss to the deficiencies in the ship's condition in that regard at the time of sailing; in other words to unseaworthiness at the time of sailing as respects the needed loading and ballasting for the carriage of glycerine in the 'tween-decks as it was there stowed.

The exceptions in the bill of lading do not reach this case. Conceding, as the respondent claims, that the exceptions of "unseaworthiness," "damage by leakage, breakage or contact with other goods," throw the burden of proof in the first instance upon the libelants to prove some negligence in the ship (The Pereire, 8 Ben. 301, Fed. Cas. No. 10,979; The Flintshire, 69 Fed. 471; The Lennox, 90 Fed. 308), this burden is met when it is made to appear that the leakage, breakage and contact arose from shifting of the cargo, caused by the improper condition of the ship at the time she sailed (The Thames, 61 Fed. 1014; Kopitoff v. Wilson, 1 Q. B. Div. 377; The Whitlieburn, 89 Fed. 526). As the shipowner, moreover, is responsible for any shortcomings of his agents or subordinates in making the steamer seaworthy at the commencement of the voyage for the transportation of her particular cargo (The Mary L. Peters, 68 Fed. 919; The Alvena, 74 Fed. 252, 254, affirmed in 25 C. C. A. 261, 79 Fed. 973; The Niagara, 77 Fed. 334, affirmed in 28 C. C. A. 528, 84 Fed. 904, 905; The Colima, 82 Fed. 678), he is in this case precluded from claiming exemption for unseaworthiness by the

terms of the bill of lading, which make it a condition that the owners shall have "exercised due diligence to make the vessel seaworthy"; and for the same reason, the Harter act (2 Supp. Rev. St. p. 81) does not avail him. As was observed in the case of The Whitlieburn, 89 Fed. 528:

> "The loading, stowing and ballasting of a light cargo are all so interdependent on one another, as affecting the seaworthiness of the ship, that they all fall under the first section of the act, which expressly confirms the owner's previous responsibility; and to cases which fall under the specific provisions of the first section, the general exemptions of the third section are not applicable. Worsted Mills v. Knott, 76 Fed. 582, 584; The Colima, 82 Fed. 665."

Nothing has been cited from the law of France, from which country the vessel sailed, showing that her owners can there lawfully exempt themselves from responsibility for negligence in not making the ship seaworthy on sailing; nor do I understand that to be the French law. But even if it were, the provision in this bill of lading shows a contrary stipulation in this case; and in any event, since the passage of the Harter act, no validity could be given to such a defense in our courts for damage arising on the high seas from negligent and unseaworthy loading upon voyages to this country. As foreign vessels receive the benefits of that act, they are bound by its limitations and are subject to the declared policy of this country in that regard, as established by the federal decisions and by the positive provisions of that statute. Worsted Mills v. Knott, 27 C. C. A. 326, 82 Fed. 471, affirming 76 Fed. 582, and cases there cited; The Silvia, 15 C. C. A. 362, 68 Fed. 230, 231.

Decree for the libelants with costs.